Mr. Curran for the appellate, Mr. Westridge for the appellee. Good morning and may it please the Court. Christopher Curran for Anthem. Obviously our main contention on this appeal is that the District Court did not do a proper weighing or balancing of the anti-competitive and the pro-competitive aspects of this proposed merger. Our argument of course focuses on the pro-competitive aspects and specifically the medical cost savings that we think the District Court failed to account for. But at the outset I'd like to say a word with the Court's indulgence about the alleged anti-competitive aspects of this merger. We acknowledge that this is a horizontal merger in a concentrated market. But we observe that this Court has said repeatedly in the Hines case and earlier in the PPG case that we care about concentration and HHIs and things like that largely because of a concern about collusion or tacit coordination. In this case the District Court addressed that concern and concluded expressly that collusion and tacit coordination was not a concern coming out of this merger. That's footnote 28 on page 92 of the opinion. The District Court's decision and the Antitrust Division's case instead is predicated on the proposition that it's the absence of the head-to-head competition between Anthem and Cigna which will be lost as a result of the merger that that's the anti-competitive aspect of this merger. So the contention is that the absence of Cigna, a 6% market presence from the continuing market is the cause of the anti-competitive effects. Was that the only reason given by the District Court? I thought she also mentioned things like innovation. Well, she did. The District Court did mention that, but that's part of the analysis of what the economists and the antitrust and the merger guidelines call the unilateral effects of the merger. So it's still, yes, innovation. That's distinct from or on top of the loss of head-to-head competition or even group competition, correct? My fundamental point, Judge Mouette, is that this merger does not raise any legitimate concern about collusion, cartel, or tacit collusion. Now, turning to the other side of the ledger, the pro-competitive aspects of this merger, the District Court categorically rejected any consideration of the medical cost savings. We believe that was an error. There is no serious dispute about the fact of medical cost savings resulting from this merger or that such medical cost savings will be passed on substantially and directly to customers and consumers. Instead, the nub of the dispute is on the quantification of those medical cost savings. And to support my point about the fact of the medical cost savings is not in dispute, I point to the complaint. I point to the fact witnesses at trial. I point to the expert witnesses at trial. I point to the provider witnesses at trial who bemoaned the possibility of their reimbursement rates going down. So the District Court also concluded, however, that the claimed medical cost savings are not verifiable. And that seemed, I don't know if it's an alternative holding or exactly how to factor that in. But on your legal theory, I take your point, and I think you make a good point. But then there's the question of the facts here. And ultimately, the District Court makes factual findings, I believe, that the claimed medical cost savings are not verifiable. So how do you handle that? What's your best argument for dealing with that? Well, I guess a couple of things. Number one, I observe the standard that we should look at is probably determined in Hines, this Court's decision, one of the few decisions dealing with efficiencies in a merger case. In Hines, the Court articulated the test as being that the District Court should conduct a rigorous analysis to assess whether the claimed efficiencies are not mere speculation or promises. That second part of that sentence is pretty important. Here, the defense provided substantial evidence that these claimed efficiencies, these medical cost savings, were not mere speculation or promises. In fact, there was a rigorous, multi-verified presentation, first with Dr. Israel, our economist, who did a claims analysis on actual claims data, billions of entries of claims data, in calculating and quantifying the medical cost savings. There was a separate and distinct integration team comprised of senior executives from both companies who did a similar analysis on their own using actual claims data. They came up with a similar number. Those are two examples of the- Your point, I gather, is that that evidence from your expert, from the integration team, the other evidence that was put in, was not sufficiently rebutted, countered, I guess, by the government in terms of showing that those cost savings would not be realized. Well, that's right, but also- I guess the District Court said, however, courted various witnesses, you're well aware, who said it's nirvana, it's going to be slow, it's going to take time, it may never happen, and we're here with a deferential standard of review on the facts, and I just need to hear how we are supposed to deal with that. Well, I don't think the District Court presented serious evidence suggesting that, categorically, there would be no medical cost savings. At most, there was some dispute about the quantification, but that kind of a dispute can't justify the wholesale disregard of these medical cost savings. And, again, the medical cost savings, not only was it done with these robust claims data analyses by Anthem and Cigna, but there's also wide recognition in the industry that there is a gap between the reimbursement rates that Anthem enjoys and the less favorable reimbursement rates that Cigna enjoys. There was overwhelming evidence of that, and the providers, again, testified about that. And even though the complaint in this case doesn't quantify the medical cost savings, again, it acknowledges that they exist. So all we're talking about is quantification, yet the District Court categorically rejected them. Even though our contention throughout the trial was a mere fraction, like one-third of our claim to medical cost savings would be sufficient to outweigh the antitrust division's own economist's quantification of the harm. So you reject, in part, then, the government's statement of our standard of review, namely that we could comb the record and come out with different findings and conclusions. But I thought what Judge Kavanaugh's questions were getting at is, I gather you have, as he silently conceded, we're just reviewing factual findings here by the District Court. Well, I guess on verification, it may have both legal error and factual error aspects to it. We think that the standard that was, in fact, applied, not necessarily recited by, but, in fact, applied by the District Court was not faithful to Hines and the examination of whether it's mere speculation or promises. Instead, it seemed that the District Court was applying some sort of standard about quantification to uncertainty, which I submit is inconsistent with what this court concluded in, say, Baker Hughes, where this court said, hey, when we're talking about the standards of review and the evidentiary standards in a merger case, they have to be realistic. They have to be such that a merging party can satisfy them. What part of the District Court decision would you point to as the best evidence of that legal error? Where would you say, where do you find that? Well, I would say that the categorical rejection, despite an acknowledgment, an unavoidable acknowledgment that medical cost savings would occur. I notice in the government's brief, it doesn't quite interpret the District Court's findings that way. It says, in effect, that the District Court found some evidence of cost, but concluded that ultimately the volume of savings that was necessary to overcome the likely competitive harm was insufficient, and in that sense found that there was, I'll put it, insufficient evidence of verification. Well, that's not the way I read the District Court opinion. I read the District Court opinion concluding on a few grounds. We'll get to merger specificity, I'm sure, but concluding that categorically the medical cost savings should not be considered, and the economists from the NHS Division didn't consider them at all. I didn't mean to interrupt you. No. You say that, but then the District Court did go on to analyze merger specificity and verified whether they were verified, and it wouldn't have, if it had just done what you say on the categorical, it would have had to go on to add it. That's why I used the word alternative. I'm not sure if that's quite the right way the District Court structured it, but it seemed that way to me reading it. I agree with your comment just now and your earlier comment that it's not entirely clear whether the District Court was identifying alternative grounds or cumulative grounds for not. It's clearly, at a minimum, deep skepticism of your legal theory, but then it goes on to seem to confront it on the facts, too, although I think your point is that the District Court did so with that skepticism infecting its analysis of the facts. That's right. That is our contention. And, again, I don't know, Judge Millett, that there is a specific fact that I can point to, but it's the overall District Court's treatment of verifiability. When it's, again, it seems undeniable from this record that there will be medical cost savings. Witness after witness testified about that. The complaint alleges it. Yet the District Court found no verified medical cost savings at all. That stands in sharp contrast to other cases. No verified or no verified ones that would outweigh the anti-competitive harm. Well, I think the former. I think the former. And if it was the latter, if the District Court, in fact, found some medical cost savings, then it's hard to explain how the District Court could accept the antitrust division's economist who did a merger simulation yet didn't include any medical cost savings at all. And without including them at all, the merger simulation doesn't simulate this merger. It is legally and economically irrelevant, and that's what we have. We have a very stark litigation strategy followed by the antitrust division to not run any merger simulations that include any medical cost savings. They could have done it very differently. They could have done one merger simulation like they did without any medical cost savings, but then also do other simulations accounting for $100 million, $250 million, $500 million. They didn't do anything like that. It was a categorical, kind of a draconian approach, that all out. I'll let them speak for themselves, but my understanding of their position is that they don't consider these cost savings to be an efficiency as that's understood under antitrust law because it is shrinking the pie rather than expanding the pie. It is just using sort of the economic force of the combined entity to reduce competition. I'm sure you disagree with this characterization. I'm just trying to paraphrase theirs that would force providers to do it if they would do it at all, which is another part of this, of course. Yes, Judge Millett, I think you're right about this. I want to segue to addressing that point about whether these can be considered efficiencies at all, and there was a segment in the government's brief about real efficiencies versus pecuniary efficiencies. Of course, we looked at those cases and we've addressed them in our reply brief, but the cases like Hershey, the cases like University Health, and even Justice Harlan's concurrence in Procter & Gamble, they all seem to tie the cognizability of the efficiencies to whether consumers are benefiting because if consumers are benefiting, there's a societal benefit to the efficiencies. Can I just clarify one thing? Sure. I'm trying to make sure I understand each stage of this as you explain it to me. When you talk about consumers or customers benefiting, are you talking about your customers benefiting or that customers in the market, we'll just say the national accounts market generally, all of them will benefit from this? Well, that's a good question. In the first instance, our customers will benefit by virtue of these ASO contracts that I think have been explained in the briefs. The contracts with the customers call for medical cost savings to be passed through dollar for dollar, and that's an industry-wide approach in these ASO contracts. There are also fully insured situations where the premiums account for both administrative elements and risk-bearing medical costs. But as to the ASO contracts, the pass-through is complete or near complete, and I can address that in a second, too. You may have noted our economist concluded 98% pass-through. Contracts call for 100% pass-through, but he was so diligent and so conservative in his analysis, he considered whether the pass-through might be recouped on the administrative service fee, and he found, well, yeah, there's about a 2% markup there, so two cents on the dollar. But in essence, as I was saying about the case law, I guess I should continue. That's great for your customers, but to the extent there have been references to benefiting consumers slash customers, doesn't that need to be all of them in the relevant market, and how does this help? Well, I don't know if it does need to be all of them in the relevant market. I'd love to hear. I don't know how much case law. Yeah. If Anthem is driving down the medical cost expenses of its customers, who are the employers, and the employers share that burden with their employees, that's even alleged in the complaint, right, that employees are bearing more and more of the health care costs. If Anthem is driving that down, there's definitely market-wide effects from that. United and Aetna and other competitors will also feel the pressure to do the same, to have costs. Was there evidence of that put into the record, that this would benefit all customers slash consumers in this market? Yes. And can you tell me where that is? Yes. Dr. Israel, our economist, testified to that expressly, and I think we've identified that in the briefs. He said, from an economic standpoint, if Anthem can drive down the total medical cost spend of its employers, of its customers, then that will apply market-wide pressure on United and Aetna and others, such that all customers, all ASO customers in the national accounts segment will benefit from that situation. I refer to question six of our gray brief on that point. Going back to the legal theory question, I guess the government, the AMA, the Hospital Association, not surprisingly, say that if you're exercising anti-competitive power, to use the AMA's terms, it's absurd to suggest an agreement between purchasers to lower their purchase prices solely through an exercise of buyer-side market power should be seen in the merger context as pro-competitive efficiency, powerful enough to offset other anti-competitive effects of the merger. So the question here is the legal question. This is going to hurt providers, this merger, hospitals and doctors. It's going to hurt them. And it's going to help, under your theory, employers and, therefore, the employees of those employers. That's right. A couple observations in that regard, Judge Kavanaugh. Number one, those amicus briefs support our theory that these medical cost savings are real and will happen, and they're consistent with the testimony at trial. As to whether it's an anti-competitive effect. Right. They don't like it for that reason, obviously. I think they don't like it because they're going to get paid less. But their legal theory is that it's an anti-competitive effect. But that doesn't hold up. The medical cost savings here result because Anthem is paying one reimbursement rate, say 50% discount off of the list prices. Cigna is paying a higher reimbursement rate, say 40% off the list price. The fact that there's a gap, a disparity there, that means that the providers have market power. Because if they didn't, they would have to charge everybody the same. All this merger does is it brings everybody onto the same level. It drives the prices closer to the competitive level. And Professor Israel testified a great length, unabutted, unabutted on this monopsony anti-competitive point. And he established, again without contradiction, that this merger will cause the reimbursement rates to move toward the competitive level, not away from the competitive level. So it's not an exercise of market power by Anthem. Because market power is defined in the merger guidelines and elsewhere as the ability to drive prices away from the competitive level. Here they're coming into the competitive level. Does that argument assume that they're offering the same product? I mean, doesn't that argument assume they're offering the same product and yet the whole premise for this merger is that there's a distinct Cigna project that actually has a different billing structure because different things are offered. That's a good question, Judge Millett. But it calls to mind the need to distinguish between the contracts in relationship with providers, where I think there may be value-based arrangements and other things, and what you're selling to consumers. What Anthem sees as its benefit from this merger, other than expanding its footprint from 14 states to nationwide and some other things, is Cigna has certain customer-facing attributes that Anthem desperately wants. Those include specialty products. These are listed in the district court opinion at page 111. And they include things like disability, vision, dental, behavioral health, and things like that. The testimony at trial, largely by Cigna's CEO, Mr. Cordani, was that Cigna has spent a decade investing in those ancillary products and incorporating them into its core medical product. Let me give you an example, which he gave at trial in his testimony. They've got a prescription benefit ancillary product. They integrate that into their medical products, such that if they see somebody's not filling prescriptions, their prescription business will alert the medical side and send a reminder to the customer. They have data analytics. They have substantial data they've accumulated over a decade. And they've invested heavily in those consumer-facing products. Anthem, as the testimony shows, has tried and failed miserably to match that. That's the testimony by Pam Cahal. Anthem was the leader in these provider collaborations. No one's done a better job of controlling health care utilization than Anthem. Right. So that relates to Anthem's relationship with the providers. Because Anthem has greater patient density, that's why it gets the better reimbursement rates, right, because the lower reimbursement rates are correlated with patient density. The hospitals and other providers are willing to pay less if they get a better patient flow. So Anthem, the evidence showed, does do better with providers. We don't need Cigna's value-based provider relationships for this merger. Thank you very much. We don't need it. Anthem does that just fine. It does it better because it has more patient density. What Anthem wants is not the provider relationship, not the value-based arrangement that Cigna has developed with its providers. Anthem's got its own. It's perfectly satisfied with. Anthem wants the customer-facing attributes that Cigna has innovated well on that Anthem has failed to match. And why can't you just do those yourself? I think I'm getting to merger. They've tried. The testimony, and this is in our brief, Pam Cahaley, which starts with a K, one of the senior executives at Anthem testified, Anthem has tried for a decade to match Cigna's wellness programs, and their consumer platforms, and their data analytics, and so forth, and hasn't been able to do it through substantial investment over a decade. That's why Anthem hasn't done it. And I contrast this, or maybe I draw a parallel to this with the Heinz case, where that was a situation where BeechNut had some superior recipes. Heinz wanted those recipes. It came to this court. It was an FTC action, so it was a preliminary injunction. But this court said, in that case, Heinz and the district court hadn't sufficiently focused as an evidentiary matter as to whether or not Heinz could develop those recipes on their own. Here we learned a lesson from Heinz, and we set out to prove that Anthem could not satisfy, could not do that stuff on its own. And that's why we got that Cahaley testimony. And that's the only testimony of that effect. I'm sorry, Judge Rogers, I interrupted you. Well, the district court heard that testimony and was convinced that the different methodologies that the two companies had needed to be explained as to how you get to this Cigna product at Anthem prices, and was unpersuaded that the Cahaley testimony and whatever other demonstration there may have been, that you couldn't do basically what we told Heinz it should do. Yes. Judge Rogers, I think the district court misapprehended Heinz. The district court said, I think pretty unequivocally, that I'm not going to find this to be merger-specific because as to the medical cost savings, how can you say Cigna getting better rates is a merger-specific efficiency? Anthem already does it. And if one company can do it, well, then the other can too, and I'm not going to look at that as a merger-specific efficiency. And they did kind of the same, the court did kind of the same thing on the customer-facing attributes of Cigna. It said, well, if Cigna's already got it, then it can't be a merger-specific efficiency because Anthem could do it. But that is not looking at the practicality of the situation, which is what's called for by the merger guidelines and, I think, by Heinz. Instead of examining whether it's practical or achievable or realistic for Cigna to get the better rates on its own or for Anthem to do the consumer-facing attributes on its own, the court just assumed it. And that cannot be squared with Heinz because in Heinz, this court didn't say, there can never be a merger-specific efficiency because BeechNet already has the superior recipes. Instead, it's a factual question that has to be analyzed as to whether or not Heinz can make those recipes on its own. So if the district court were to view your evidence as, well, you didn't try hard enough, what's your response? My response is, under Heinz and Baker Hughes, there has to be a realistic, commercially realistic, commercially practical assessment of what is achievable, both in terms of merger specificity and verifiability. Mergers exist, as the NFS guidelines acknowledge, in large part to get efficiencies. If courts condemn efficiencies or fail to recognize them too quickly as being not merger specific or not sufficiently verified, we're going to end up condemning mergers that help society and that drive prices down, like this one. Well, another way could be that there has to be a better demonstration of how you're going to achieve your goal, and that was what the district court was faulting. Maybe. Maybe it's all a matter of degree of how high the standard is, but here the evidence is pretty powerful by Mr. Cordani and others at Cigna that they've invested for a decade in developing these innovations. And Anthem, on the other hand, has expressly stated that they've tried and couldn't do it. Tell me, just to drill down on this, why can't Anthem, first of all, when you have this prescription monitoring thing, is it monitored by the pharmacy or by somebody at Cigna? It's monitored by the prescription benefit company, which Cigna has one of and Anthem doesn't have one. Okay. That's why I referred to page 111 of the opinion, because the district court acknowledges that as to these ancillary... But where is the evidence that Anthem couldn't have one of those, tried and couldn't? Well, again, I referred to the Cahaley testimony that Anthem has tried. Now, Anthem... On that specific thing, on the specific prescription monitoring? No, no, she doesn't address... Is there another example that you're comfortable pointing out? Well, no, this is not a confidentiality point. It's just referring to the record. She's trying to understand how this was proven. Her testimony was more categorical that Anthem has tried to replicate Cigna's wellness programs, which would include things like the prescription monitoring and behavioral health monitoring and making sure that people with heart disease and diabetes go to the dentist, because an infection there can be complicated. Those kinds of things that Cigna has done, Anthem has tried and failed to replicate. I thought this witness also said that Anthem was hopeful, that the effort was still underway and you're hopeful about the outcome apart from any Cigna mergers. Yeah, yeah. It may be a forlorn hope, but, yeah, I'm not suggesting Anthem has turned up its hands, but it has tried and failed. Right. Did another Anthem witness testify that the real problem wasn't logistical ability but marketing? And that's really what you wanted to get was the... Well, I think the brand and reputation will follow the reality on this, and I don't know which witness you're referring to, but the fact of the matter is, as the district court did acknowledge, Anthem, as a factual matter, doesn't have these ancillary products, so it necessarily doesn't have the ability to incorporate them into its core medical product. Right, but under Hines, then we have to show that you wouldn't be able to do it. You could say, yeah, we haven't done that yet, but if you could do it. Well, again, it's a matter... Georgia and Colorado that both said this was really a marketing thing. You may want to get the brand name. Again, it's all a matter of commercial practicality. We could say Apple can develop an airplane. They can create a version of the 747, no question about it. Well, that's a little bit further outside their wheelhouse than what we're talking about here. Yeah. You say it's that far outside the wheelhouse, and we're back in the problem of your actually comparing very different products. That's a difficulty I'm having is when you say it's so different, you can't do it without the merger, then I'm not sure it's right to say that the price difference is something that you're just, it is just a price difference that you're lowering, that there really are apples and oranges here. Well, but again, the price we're talking about is the reimbursement rate with the provider, and the customer-facing attributes we're talking about are different. Those are customer-facing. Those are two different contractual relationships we're talking about, and I think it's important to keep that separate. Providers have nothing to do with this Cigna brand. I mean, I think the sense is that they have a role in this as well. Yeah. There's nurses and things like that that are involved. Am I wrong in understanding what you're saying that way? That stuff we're not debating can be replicated. We're not saying that Cigna hires a nurse and that's something Anthem can't do. That's not the pricing. They haven't hired for a specific – of course, you've got plenty of nurses, but they're hired for specific tasks and purposes, and the department to monitor X, Y, or Z, or make sure they're using their inhaler or something like that. That is something you could do, but if that's built into that price difference, then it's really not – you're not equating things when you just push that price down. You're not eliminating difference. You're pushing right through actual substantive differences in the two products. But those are things that the customer would be paying for, not the provider. So, again, I draw the distinction in that regard. Ultimately, what Anthem wants to do with this merger is to bring out a product that it can have, not only in the 14 states but otherwise, where the Cigna customer-facing attributes can be married with the advantageous Anthem reimbursement rates, and that would be a product that neither company can do on its own. And we think that as a factual matter, as a matter of commercial practicality, we've established that that is the case. Why don't we hear from Ashley? I'm sorry, can I ask one more question? I'm sorry, I apologize. This is just trying to help me understand. I'm not sure why this is. So, the status of this efficiencies defense, as you know, is still something that's evolving in the law. And every court of appeals decision, including Hines, said that the efficiencies defense can be used to rebut the prima facie case. But that's not what you want to use it for here. Right? Your prima facie case was rebutted, and we went to sort of step three, and that is just the overall assessment. And it struck me, the 11th Circuit actually has a footnote that says, footnote 29 of that decision says, of course, once we're past the prima facie stage and there's been a showing of an actual anti-competitive harm at that third stage, then the efficiencies defenses don't come in. And the ERETA says the same thing. So, I'm just trying to figure out what precedent do you have for applying the efficiencies defense in the way you want to apply it here at this third stage as part of the big picture? I just don't understand. I'm not sure why the law has gone that way. It doesn't seem to me everything should be in the mix at the third stage. But the precedent hasn't gone there. Can you explain to me why the precedent is where it is and why both the 11th Circuit and Professor ERETA have gone out of their way to say, oh, no, once there's proven at the third stage, then you don't get to bring in these defenses? Well, Judge, I think you're right that the law is evolving as to efficiencies. And I think that was the university health decision you must have been referring to. That was the first appellate decision ever to consider the efficiencies defense and the need to do the weighing that we're advocating here. But Baker Hughes, by this court in 1990, said that the – and, again, the specific issue before the court was as to the prima facie case, but the court went further to talk about Section 7 generally and said essentially that all relevant circumstances have to be considered. It was reminiscent of like a rule of reason analysis  And I would submit that that logic, that vision for Section 7 applies here, even after the prima facie case. And I would submit even further that in a situation like this where the product at issue is selling a network with discounted rates, and if medical cost savings, which is the core part of that product, if those aren't considered, then you're not actually even properly evaluating the price of the product you're selling. So putting aside for a minute questions about merger specificity and even the question about whether this is an efficiency at all, if we're right that medical cost savings will occur and will lead to less spend by employers and employees on their health care costs, then, of course, that needs to be considered in the Section 7 analysis. That's what Baker Hughes says, totality of the circumstances. How can you turn a blind eye to the elephant in the room, if I can use that term in this context? And that's what the district court did, and the district court had to do kind of some calisthenics in order to get there with its conclusion that medical cost savings aren't even part of the product being sold. Well, as I think we pointed out in our brief, in about six or eight places earlier in the opinion, the district court had acknowledged that medical cost savings are not only part of the product, it's the core part, it's what companies use to distinguish themselves, and it's what consumers look for and employers look for when they're trying to pick a health care provider. So by shutting down consideration of the medical cost savings, the district court was blocking out, I say in violation of Baker Hughes, a core part of the product, a core part of the business, and a core part of the consumer welfare issue. I hear that argument, which just sounds like your evidence was countering their evidence of any competitive behavior without needing an efficiencies label, right? You're just saying, I just don't understand this efficiencies model, when at least sometimes it looks like you're just actually disproving the government. Part of the problem is there are so few appellate decisions on major cases that the law has not developed the way it should. Maybe this is an opportunity for that to happen. We didn't find many district court decisions that did it outside the prima facie context either. One or two, but we didn't analyze it. Don't hold me to this, but I think one example of the Long Island Jewish Medical Center case, which was one where purchasing efficiencies were credited, that may have been in the competitive effects analysis rather than just prima facie case. That was one example. And then Judge Sporkin, who was looking down at us over here, wrote the Cardinal Health decision, and there he also credited purchasing efficiencies, although that may have, I don't recall off the top of my head whether that was in the context of prima facie case or competitive effects. I'm not saying whether this distinction makes any sense. I'm just trying to figure out why it would make much sense. It doesn't make sense, does it? It doesn't make sense. But for some reason the 11th Circumstance Procedure really doesn't. It doesn't make sense. And I think the current version of the merger guidelines generally take the position, hey, all of this goes into competitive effects. Let's consider everything. I think that's faithful and, in fact, maybe driven by Baker Hughes. So if you take everything into account and assess it from a competition and consumer welfare standpoint, is it pro-competitive or anti-competitive? And in that context, how can you exclude medical cost savings? That's the $2.4 billion issue here. All right. Let's hear from the panel. Thank you. Good morning, Your Honors. May it please the Court, I'm Scott Westrick on behalf of the United States and the plaintiffs' states. Mr. Curran has repeatedly referred to medical cost savings as a consumer benefit, and I think it's important to start by pointing out, even if provider rates do go down, and, yes, the government alleged and proved that they would go down to some extent, although we've never conceded any amount anywhere near $2.4 billion, but that doesn't mean that overall medical expenditures will go down. The government alleged and proved that this would come at the expense of innovation, at access to medical care, the Cigna product itself would be damaged, and in particular, the Cigna product is structured to reduce overall medical expenditures through wellness programs, the collaborative provider. They want to take advantage of that, though, through the merger. Well, Your Honor, as the district court- Anthem wants to take advantage of that, I thought was the evidence. Well, actually, I just heard counsel saying that they don't want to take advantage of the collaborative provider arrangements, which are an integral part of the Cigna product. No, the consumer-facing, I think, the consumer-facing aspects of Cigna's product. The customer-facing, yes, but I want to make sure it's clear that the provider, the collaborative provider arrangements- Can I ask a big-picture question to start? Yes. As I understand it, and I'm going to simplify it for present purposes, this merger will, as you just said, lower provider rates, and therefore hurt hospitals and doctors, which they object to. But then those savings, some amount, significant, we can debate, will be passed on to employers, which will help employers, and therefore help their employees in one of the great societal problems in the country today, the high health costs paid by employers, which, therefore, diminish employees' incomes. So line employees' incomes are hurt because of the amount of employer money that goes to health care costs. And this merger is alleged, and the expert evidence would help those employees and help the employers at the expense of hospitals and doctors. What is, if the ultimate focus should be on the consumers, the employers and the employees, what is wrong with that at a big-picture level? I know you're going to attack various factual pieces of what I just said as you go through your presentation, but if that were the case, if we knew the money, the savings were being passed through to help employers and employees, why is that a legal problem? Well, two points, Your Honor. First of all, we don't know that there would be any actual overall reduction in medical expenses as a result of provider rates being pushed down, because utilization could go up. The court found that the Cigna product is going to be harmed. I mean, right now there are customers out there in the market buying from Cigna, even though its provider rates are higher. So your utilization stays the same? Okay, well, that's a counterfactual assumption, and that's something that Anthem's expert also never took into account. So putting that aside, okay. Well, then my next point that I was going to make is, this is really outside the scope of what a judge should be considering under Section 7. We're not asking the legal – I'll let you finish what you were just saying. Sure. And I'm just getting on the pure law here. Okay. I'm trying to figure out, and we'll get to the facts. But on the pure law, if it's going to help employers and employees reduce their health care costs, that seems like an improvement in competition, consumer welfare, and that seems like a good, a positive. Well, I don't think it's an improvement in competition. And under the antitrust laws, we don't favor one market group over another. The Supreme Court said that in the Mandible Island Farms case. We care about everyone in the market. And when we talk about this type of transfer of favoring one group over another, it's really outside the scope of Section 7. The judge faced with a Section 7 case should be looking at whether there's a substantial lessening of competition, not whether some other allocation of private services. I think on what you just said, medical cost savings shouldn't be considered at all. No, I'm not saying that at all, Your Honor. Of course the court should consider efficiency defenses, and the court very clearly considers them very carefully in this case. But if that's true, you just said any medical cost savings are going to come at the expense of hospitals and doctors. And you had earlier said we shouldn't be making that kind of judgment of favoring one group over another. And the reason it's going to hurt doctors and hospitals is because of the increased market power, monopsony power potentially, vis-a-vis the doctors and hospitals. It's absolutely true that it's a legal matter no court has ever held, and I don't think this court should be the first, that we can defend anti-competitive effect, anti-competitive conduct in one market here and anti-competitive merger with anti-competitive conduct in another market. So we haven't had a case like this. I think this is the insurance market is unusual, if not unique, in this circumstance. And giving, again, theoretically, I'm just struggling with even how to think about this out of the box, but giving greater purchasing power to a merged company that will help employers and employees not deal with the spiraling health care costs. What you're saying, I shouldn't worry about that, which I understand. I'm not saying that it's not an important issue. I'm saying that it's important that judges and sections, when they're faced with Section 7 claims, look at whether there's a substantial lessening of competition. And you said earlier, I think, that competition would be benefited here, and I would disagree with that. There's absolutely no showing that competition is going to be benefited by the elimination of one. Well, competitors are not going to be benefited, but we don't look at it. I don't mean competitors when I say that. There are only four significant competitors in the market. This merger would eliminate one of them. It would eliminate the one that's because it's been smaller and hasn't had the market share and hasn't been able to go out there and get at lower provider rates. It's had to innovate and develop good wellness programs, develop collaborative arrangements with doctors that have driven down overall medical costs for customers, and that is the competitor that would be eliminated. And the incentives to innovate are going to be less, not more, after a merger that eliminates that competitor from the market. So competition is not being enhanced in any way. I caught you off earlier about utilization. Can you expand on that some more? Yes, and I think that the court, the district court, recognizes quite clearly that it's really an incomplete picture if we only look at what the provider rates are, because if you don't need to go to the hospital, let's say, at all, the overall medical costs could be lower even though Cigna's discount at the hospital may not be as big as Anthem. So it's really just, it's a myopic view. It's too limited of a view. We need to look more broadly at whether overall medical costs are going down. And as I said, many customers are out there today buying from Cigna even though it doesn't have the same provider discount. What's the theory that utilization would go up after the merger? Are the facts that support the theory? The theory is just that we would be eliminating the competitor whose product is focused on reducing utilization, and that it's very much about the collaborative provider arrangements that we've heard counsel say that Anthem is not interested in and that the record was quite clear would be damaged by the forcing down of rates that we're talking about. I thought the utilization was also connected, I'm repeating myself now, to the consumer-facing aspects. Your Honor, I think it's connected to both of those things, and I don't think that they're separable in the way that that's been suggested. And certainly it's all part of the integrated Cigna product that Cigna is out there selling to its customers. It's not picking and choosing. They're selling their access to their provider network as well as the wellness programs. So that's close to your expert's statement about it really didn't matter how large the medical health cost savings would be. It would not be sufficient to overcome the adverse impact on competition. Yes, Your Honor. It is our position, and the Court also found, that these aren't efficiencies in the sense that nobody is doing anything better. There aren't fewer societal resources being applied either to the sale of health insurance or the provision of medical care. No, but what I was trying to follow up on Judge Kavanaugh's big-picture question, is the plaintiff in this case challenging sort of the underlying premise of his question? Or is it simply saying that our examination and investigation of what's proposed here do not show that that result will happen sufficiently for purposes of allowing this merger to go forward? Your Honor, we absolutely pled and proved that there would be some reduction in provider rates as part of our buy-side claim, and we believe that that would occur through an unlawful exercise of market power on the buy-side of the market. But we have never conceded or there's nothing in the record in terms of the $2.4 billion or that they will be entirely passed through or nearly entirely passed through. But the hypothetical of the question would be assumed that there is $2.4 billion in savings, and 98% of it is passed through to the employers in this market. Right. Well, okay, a few points on that. First of all, when you say savings, I think that certainly in the way Anthem has presented the case, that's not taking into account the utilization that we've been talking about. It's not taking into account the court's findings on innovation and the degradation of the Cigna product. So somehow that would need to be factored into the analysis. And, of course, there are many findings, and I'm not going to quibble with the $2.4 billion. I'm taking that as a given in your hypothetical. But, also, it would be through the unlawful exercise of market power on the buy side. So, in that sense, it can't be an efficiency at all. The district court didn't reach a conclusion on that point, though. That's correct, Your Honor. The district court did not, and this court does not need to reach that issue either. I take your point there. But you're relying on it in part as why we shouldn't conclude that this overall merger would be beneficial for competition. It's because of the buy side monopsony, even though there's no district court finding on that. Well, I was responding to Judge Rogers' hypothetical. We have many other arguments about why that should not be the case here. You know, we haven't gotten to a verifiability and merger specificity. Well, I was going to ask about verification and verifiability. Suppose it comes down to that, just for purposes of the discussion I want to introduce now. They say that they put forth expert evidence that showed it would be passed through, and conservative estimates, 98% would be passed through. And I think, paraphrasing the response to the district court, is the district court picked a few snippets of things. Well, it's going to be hard. It will be a challenge, McKinley and Urbana, various quotes. But those quotes don't really defeat the basic economic finding that the medical cost savings would be passed through, and thus were sufficiently verified. And the ARETA tree just says they don't have to be, this is predictive, you don't have to, you know, you have to approach this, I guess, with some common sense. So how do you respond to all that on verifiability? Sure. Well, first of all, I think the pass-through point is only a very small part of the problems for Anthem on verifiability. But I'll start there. First of all, I don't think there was an economic finding that these would be passed through. Quite the contrary. The court thought that there was evidence to suggest that Anthem's internal strategy, there were documents suggesting that Anthem does not want to pass through all of these costs. There also is economic testimony from the government's expert regarding the types of models in these situations when market shares get very high, for example, in the Richmond market up to the 78%, depending on the market share measures you're using. Pass-through is likely to be very low at that point because if you're already winning most of the bids, then you have no reason to pass, when your costs go down, you have no reason to pass that on to your customers. So I disagree. One of the responses to that, I think, is that the contracts will require or do require pass-through. Right, but when the contracts expire, they'll be renegotiated. So, I mean, there could be a short-term issue. But on your broader question about verifiability, I think verifiability means both that these are going to happen at all, and then there's the question of, okay, if some of them are going to happen, what will the magnitude be? And the court clearly found that she doesn't think any of this is going to happen at all, because it was premised as we're going to bring the Cigna product at the Anthem price to the market, and now we've. You mean the savings? Yes, the medical cost savings, thank you. And Anthem has retreated significantly from that, we're only talking about the wellness programs, the ones that, I guess, are easily moved over to Anthem. So it really would just be an Anthem product with a few wellness programs slapped on it, which, as the court explicitly found, Anthem could do that today. And it's chosen to pursue a different strategy. It hasn't been as flexible, and it's proactive in developing these types of products. But it could do that, so that's not merger-specific. And I realize I've gotten away from verifiability there, but these issues interrelate. But one thing we didn't hear counsel say very much about at all is, how is any of this going to happen? And the district court was actually very focused on that. And a key thing that needs to be taken into account is, Anthem needs to comply with what are called the best efforts rules of the Blue Cross Blue Shield Association. And a very high percentage of its revenues in the 14 Anthem states, 80%, must be on the Anthem network, which means using the Anthem provider network and Anthem contracts. And the testimony was clear from Mr. Swedish, from the Anthem CEO, and from the Anthem executive in charge of integration, that Anthem needs to move as many Cigna customers as possible over to the Anthem network. So that's, and then that, how do you do that? Well, that's what's called rebranding, which you read about, I'm sure, in the briefs and also in the court's opinion. But rebranding does not bring the Cigna product. It brings, it just moves customers over. And they can do that today. They can, you can, customers can buy the Anthem product at the Anthem rates today if they want. Well, this is where they come back to how you planned and proved the case, too, on the buy side, which is that you agree that they're going to get lower provider rates, correct? Yes, Your Honor. We definitely alleged and proved that there will be a decrease in provider rates. So on how this is going to happen, we know both sides are in agreement. They're going to be lower provider rates for savings. The question really then, if that's true, one, I suppose, is the amount, but the other is really the pass-through question, whether it's going to be passed through or not. The pass-through is important. Issues that I mentioned earlier about innovation and the harm, you can't separate our allegation that there will be some reduction in provider rates from what we alleged and proved and the court here found is that there will be reduced quality and fewer provider collaborative value-based provider collaborations. So you can't separate that issue. Can you explain what you mean by that? Yes, value-based. Yes, the idea is, and CIGNA's CEO, Mr. Cordani, testified about this, and I think it was discussed in the district court's opinion, that CIGNA works very closely with providers to align incentives, so financially align incentives, so that doctors and hospitals and other medical providers have a shared incentive with the insurance company, CIGNA, as well as the customers and the patients to improve health outcomes and reduce utilization. So the fact that Mr. Cordani gave an example of asthma patients and CIGNA's been successful in working with providers to monitor that the patients are following the medical regime properly and this has significantly reduced the number of hospital visits that are necessary. To be clear, who does that monitoring? Is it a nurse or someone in the doctor's office? I'm not sure. Someone in the insurance company. Right. It may be an employee of the insurance company. I'm not certain on that. So then that wouldn't have to do with the provider relationship? I think, going back to your earlier questions, that there is, there are probably some wellness programs that are entirely separate from the providers and that are easily carved off, and others that require interaction and involvement with the providers, and so there's probably a mix of wellness programs. And I'm not specifically sure how this particular one should be categorized or characterized in that sense. I didn't mean to interrupt. I have a question. I want to make sure I'm answering Judge Kavanaugh's question. So I think I was saying about aligning incentives. So the court found if you want to have these kinds of relationships with providers, you have to pay them more in some way. And we had an example in our brief where I think actually the name of the entity is not in the public record, but CIGNA not only pays for the specific services provided, but it also pays a care coordination fee per member. And then it also has, if certain agreed upon quality and outcome, medical outcome goals are met, that they can share in monies for that as well. So it's a way of aligning everyone's incentives to reducing overall utilization and improving health outcomes. So that's what is meant by the collaborative value-based provider relationships that are a very important part of the CIGNA product. When you talk about the cost going down, but what folks are getting for that cost, and that's why I'm trying to zero in on that. When you say that you introduced proof that costs would go down, does that include, do you agree that that would include the price of a CIGNA-type product going down, or was your proof premise on the fact that if that went down, the CIGNA special stuff would drop off? Your Honor, we absolutely allege and prove that as a result of the forcing down of provider rates, the CIGNA product that customers now want and that's been innovated in the market would be harmed as a result. Harmed as in they just wouldn't get it? I'm thinking about rebranding here. When someone is brought over, do you say, just trade me your CIGNA card, you now have a blue card, but everything is the same, or do they come on to the ANTHEM program? What was the evidence? Because it was just a slight reduction in the CIGNA plan, CIGNA service, CIGNA product, but a big decrease in price, that would be one thing. But if there's essentially a drop-off of the special CIGNA product in exchange for that price, that's a different type of case. Right. Well, with rebranding, it's about asking CIGNA customers to move to the ANTHEM network. ANTHEM is something that you can't forcibly rebrand, and they simply would lose all access to the CIGNA network if they chose to sign ANTHEM contracts. Part of the reason for the rebranding, again, is the Blue Cross Blue Shield rules, and it's they must be using the ANTHEM Blue provider network, so they wouldn't have access to any of the collaborative arrangements. Yes, there's an overlap because there's plenty of providers that cover or serve already both ANTHEM and CIGNA insurance. And so I'm going to go, I've got my Blue card, I'm going to go back to the same doctor, but now that doctor is not going, or the nurse or whoever is not going to do the monitoring program or the wellness program with me, that's all going to drop off. That was your proof in the district court finding. Well, first of all, yes, the providers are essentially the same, and for purposes of Dr. Israel's $2.4 billion number, he is only looking at providers that are identical on, you know, the same providers that are on both networks. So that's true today that it's the same providers we're talking about, but there are still two different products out there. There's an ANTHEM product and a CIGNA product. And even though the same providers are involved with both, and it doesn't mean, of course, that a provider isn't providing good medical care when it's seeing an ANTHEM customer versus a CIGNA customer, but CIGNA has an integrated approach that's both the wellness programs and trying to align incentives, follow-up about whether prescriptions are being taken, all those kinds of things. So what we've argued and what the court found is you just can't carve off these pieces. And CIGNA's CEO, Mr. Cordani, said you can't just plug and play. You can't pull the collaborative provider arrangements out of the CIGNA network and plug them into ANTHEM. It's a way of interacting with the providers. They have to have trust in the insurance company that both parties have the same common goals. And there is evidence that ANTHEM has been very inflexible with providers and sort of taken a take-it-or-leave-it approach. That hasn't worked as well, and it hasn't needed to, first of all, because it's had bigger discounts based on its bigger market habit. Next. Do you argue for any deference to the horizontal merger guidelines? I'm sorry. Do you argue that we owe any deference to the horizontal merger guidelines? They're obviously not binding on it. Only when they help you. They're not binding on the court, but as you probably are aware, many courts have relied on them. Nobody ever mentions whether they'll cite them, but no one ever mentions whether this is some sort of hidden covert skid more deference. I'm not suggesting that at all. It's just that's a nice resource, and that's all you're suggesting. No, it's more that there are obviously a lot of care that's gone into them, and they're based on a lot of thinking and how these issues arise in the real world. So as a result, courts have found them to be an important source for thinking about how to analyze mergers under Section 7, and over the years, of course, many courts have relied on them. And I think there are – I don't have in mind any decisions,  lines about the type of, you know, the role that the merger guidelines are playing in the thinking. And in the Hines case, for example, this court cited the then-existing version of the merger guidelines extensively. And then on – this is one last question. On the – there's lots of talk about Anthem getting the Cigna product, but to the extent Cigna would be able to take a special product through this merger and assume they were able to continue providing it at a lower price, maybe not all the way down to the Anthem price, but that gap would narrow somewhat, that would be a merger-specific efficiency, would it not, from a Cigna perspective? Right. I mean, I think, Your Honor, what you're getting at is the Cigna product at the Anthem price, which is what the court found is simply unlikely to happen, because it's just the Anthem executives, as well as the Cigna executives, recognize this conflict between trying to develop and maintain collaborative provider arrangements and also going to providers and trying to force down the rates. I think there was testimony that you just can't go into a rate-based discussion and then suddenly walk out of that discussion with a collaborative provider arrangement. So that's an important reason that the court found that what you're talking about, the positives of the Cigna product being brought into an Anthem rate structure, is unlikely to happen. Well, I think – again, I don't want me to put words in their mouth, but I assume they would say, okay, so maybe on day one, we're going to need a little time to do this transitioning and working with the providers, but now it won't be just Anthem. It will be Anthem and a Cigna person that they know, or maybe a Cigna person that they know now wearing an Anthem shirt, talking to them during these negotiations. And so over time, the goal is to get more of that actual Cigna product by at the Anthem prices. What is your response to that, in particular, this rule of time in analyzing verifiability? The rule of time, yes. Well, first of all, I actually heard them say that they're not talking about bringing over the Cigna provider relationship. So that's one point. Well, I think it was a package deal of the customer facing and the provider facing, because you said you thought it was generally more interesting. Right, right. But I just wanted to make clear that that isn't even, I think, what's on the table here. And, well, so first of all, another important factor to take into account here is, to the extent that that could readily be done, say, over a reasonable amount of time, it's something that could have been done already, and that's what the court found. In other words, it's not merger specific, because if it's something that could be readily accomplished at the lower Anthem rates, there's nothing from stopping Anthem from doing it before. There's nothing proprietary, nothing patented. The court had findings on that. And like I said before, there was evidence, in fact, that Anthem just, you know, it's chosen a different market strategy. It's not that it was necessarily a bad strategy, but that strategy was to focus on lower rates. Could we assume, just assume that, at least as to the customer-facing, assuming we can sever that out. They tried the customer-facing aspect of Cigna. They just, they tried. It didn't work for whatever reason, hand-handed or just they've got a bigger structure and it was hard to zero in or whatever the reason. And if the proposition now is we'll have those Cigna experts who knew how to design this and make it work, the rubber meets the road. That's what they're the experts at. We're going to have them now on the team, but it's going to take time, right? The day we switch your Cigna on Blue Card, it may not be like that. If that were the understanding of their evidence, what would be the flaw? What would be the flaw? Well, the principal flaw would be that let's assume it's a hypothetical where it would take one year to implement some change in your product if you merged. I mean, the flaw with that is even if it might take three years, if you didn't merge, we don't allow companies to merge just because they could do something a little bit easier. I mean, I think that's the message in the Heinz case with the recipes for baby food. There is no showing that Heinz on its own couldn't develop better recipes. Yes, it would be easier to acquire a company and eliminate a competitor from the market and get that know-how, but we don't allow mergers to go forward that keep in mind that it's absolutely uncontested for purposes of this appeal that this merger will harm competition but for consideration of the medical cost savings. So we don't allow an anti-competitive merger to proceed just because it will be a little bit easier for a company to do something that it wants. And as I said before, it's Anthem that has chosen its strategy, and the idea that its incentives to innovate are going to be greater after the merger, it's really not supported. The incentive to innovate will decrease. There was evidence in the record that Anthem has actually responded to Cigna's innovation where it's needed to and offered more innovative type guaranteeing medical cost levels and that type of thing in the market, but that competitive pressure is going to be eliminated by the merger. So that was a long answer to your question, but I think that's exactly the kind of thing that we do not allow under Section 7. But there are one way or another the provider rates are going to go down if the merger goes through. To some extent, Your Honor. That's a yes? Yes. Yes, they will go down, but there will also be a loss of quality, a loss of innovation, and they will go down as a result of an unlawful exercise of market power, and we don't know the extent to which they will be passed through. The district court said it wasn't aware of any reported case in which a court had found that the any competitive effects of a merger outweighed by the combined firm's ability to buy supplies more cheaply due to its size. What's the best case that says that's not okay? Well, Your Honor, this goes to the question of whether it's an efficiency at all, and we raised the distinction between real savings and pecuniary savings. But it's correct that there are some district court decisions, for example, the Staples, the first Staples decision in the District of Columbia, that the defendants have raised as part of their efficiencies arguments that there would be some savings due to volume discounts and increased buying. In all of those cases, the efficiencies were rejected for a variety of reasons, but without specifically deciding whether that volume discount could be a cognizable efficiency. But the other point I want to make about that is a volume discount can be a cognizable efficiency, a true efficiency. But it depends on the circumstances. So why is that if the volume discount is coming from the exercise of market power on the buy side? Well, it isn't necessarily the result of that, and that's, I think, the reason. So, for example, in this case, if it were more efficient, if a provider could provide the same care more cheaply because it's dealing with one insurer instead of two, for example, that would be a true efficiency, and that efficiency would not be a result of an exercise of market power on the buying side. And in some situations, it's the sellers of, you know, whatever is being bought, the input, so like in the Staples case, office supplies, many sellers offer volume discounts, and if the merging parties may not have been buying enough to reach the highest level of volume discounts that are already being offered in the market, so that clearly wouldn't, you know, they would be able to get those then, and presumably the seller is offering them for its own efficiency reasons, and that wouldn't be through an exercise of market power. The only point of my question is I think we're in novel terrain, at least in terms of Supreme Court precedent, D.C. Circuit precedent, and really other court of appeals precedent on this threshold legal question. Now, you argue, even if, I think you argue, even if you're wrong on the threshold legal point, you still went on a fax here because it wasn't proved that the pass-through would occur. Is that correct, or is that misreading what you're saying? I just want to make sure I understand on the threshold legal question. So whether these kinds of pass-through savings, if they were approved beyond whatever the standard is, in a particular case, even if those were proved, you would say you shouldn't recognize that in this context. I think that's your legal argument as a matter of law. Right. So let's suppose, so let me just tease it out here if I can. Let's suppose the fax were proved that 100% of the cost savings would be passed through to the employers, and those would be huge, and that would be really help employers. Let's assume all that. I think you're still saying that's not legally cognizable in this context because it would be as the result of exercise of market power on the buy side. Right. So is that correct? Just to be clear, the district court's opinion can be affirmed because on the grounds that the cost savings are not verifiable, that they're not merger specific, and there's no, I mean, there are many cases that discuss those. I'm calling your factual argument. I mean, it has a legal basis. So I just wanted to be clear about that. Then there's also the argument, which is an independent one that this court does not need to reach, which is that these aren't efficiencies at all. And there is support for that in the case law. The Third Circuit and the Eleventh Circuit have said we have to just look at real efficiencies. That issue also does not require you to think about whether it's an unlawful exercise of market power. It turns on the fact that this is just a transfer from one market participant to another, and that no one is doing less for less. Sorry, I said that wrong. No one is doing more for less. Can I also ask in regard to that, the same question that I asked your friend, and that is when we talk about the economic benefit that comes from decreased prices to be a cognizable efficiency, is it enough that it just benefits their customers? Maybe it is. I'm just asking the question because it seems to me that it's a benefit that you only get if you buy their product, and it's a benefit that tends to monopolize. You want this benefit, everybody better come over here and we'll be down to one company. Right. On the other hand, it seems a bit hard to insist that everybody benefits. Right. I mean, I think that the easier way to think of that issue, Your Honor, is that there's actually no reason to believe that costs are going down for anyone here, for the reasons that I've already talked about in terms of utilization. That's the fact, I'm trying to get to this big legal conceptualization thing, and so how do we understand who the consumers are that are benefited to have something become a cognizable efficiency? If your argument is we'll press prices down and then that will benefit other people, although the Anthem product all along has been we have lower prices than anyone else can get, which suggests that maybe they won't be able to benefit or come down as much, and people will flood into the Anthem product. So what I think is where you're calling the legal issue, if I understand, is the argument which is the separate basis that the court ruled on, which is that these aren't really efficiencies at all. Well, the theory, I think Judge Cameron, I'm not going to put words in his mouth either, but was asking about this understanding about pushing down the prices and its role as a matter of law in becoming an efficiency, because it would have this benefit, obviously, for people assuming pass-through, for the folks that contract with Anthem or a new combined company. And assuming that there's no degradation of quality in the Anthem. Because I think he was asking about the non-fact specific understanding. Isn't there another aspect of that that we have to see? Is it enough to say that our customers will be better off, will enjoy lower prices, or do they actually have to show that consumers across the relevant markets will enjoy lower prices? Right. I think that's a fair point, Your Honor, but I think that the better way to look at this is it's about whether there's a substantial lessening of competition in the relevant market. That's what Section 7 turns on. It's about competition because our antitrust law, Congress determined and the Supreme Court has said a number of times, that competition is what leads to the best levels of consumer welfare. So that's where it helps to, I think, bring it back to that. And that's how I would answer your question. But even if there are fewer participants in the market, but prices will go down, is that a benefit to competition? Assuming no other harms in terms of quality and so forth, I don't see how that necessarily would be a benefit to competition. I mean, that's a hypothetical that's very far from the truth. I'm trying to focus on what the Supreme Court's told us to focus on, which is it's not about competitors, it's about consumers. Right. And what consumers care about are price and quality, among other things, but primarily price and quality. I mean, I think that the Supreme Court has said it's about competition and it's not only about end consumers, it's about other participants in the market. In the Hines case, the court was looking at whether there would be harm at the wholesale level and specifically said it's not necessary to show harm at the increased prices at the ultimate consumer level. I'm ready. All right. Thank you. Judge Rogers, may I have a few minutes? Yes. Thank you. A couple of random points. First, I note that on page 129 of the district court's opinion, the district court expressly disclaimed reaching any conclusion about the availability or quality of service as a result of the merger. So, if quality is put to the side, let's consider price. Well, let me just be clear about that. She did talk, though, to the district court. I mean, I'm just trying to get 129 in front of me. What sentence are you referring to? I'm referring to toward the top in the carryover paragraph. Nor is there sufficient evidence in the record to reach a determination on whether the buying power that would accompany the proposed merger would result in a reduction in the availability or quality of service as plaintiffs have suggested. Well, I have to tell you, I read that last clause as qualifying what she was finding, but, again, it's understood. I appreciate your point, though. Okay. So, at least for the moment, if we put quality aside and assume that that's staying stable, I think we just heard from Mr. Westrich a confirmation that the government's position is that there will be some medical cost savings, that they need to be considered, and that they should be weighed. And, in fact, the last part is consistent with the merger guidelines, which say, in this type of situation, there should be a merger simulation that incorporates efficiencies. That wasn't done here. The government's expert witness did not provide for any medical cost savings in the merger simulation that he ran, and the district court categorically did not consider the medical cost savings. Well, he also questioned whether these are the kinds of efficiencies that can be considered. I thought he also questioned that. Yes, yes, and that's a separate question, but the one I addressed in part at the outset, right? I think considering the cases that are cited in the government's brief, Hershey and University Health, those cases ask whether the efficiencies are going down to benefit consumers. Here they are. Therefore, they're real efficiencies, not pecuniary ones. This is not a situation where it's a reallocation of money among people in the distribution chain. This is dollars in the consumer's pocket, and that's what distinguishes this from certain other cases. He mentioned a few things, and you may get to them, but I want to make sure you address utilization. Yes, I was surprised to hear that, because the – and this is in our reply brief – the evidence at trial was unrebutted, that utilization was better under Anthem's provider relationships than under Cigna's. And the evidence was also unrebutted, and this was delivered by Mr. Drozdowski, and this is, again, in our brief and attributed to him. There was – Just so I'm clear, I want to make sure when you say better, what you mean better. Yeah, I guess that's a good question. The utilization of particular doctors was less, in other words, more efficient, okay? And then Mr. Drozdowski testified – Just again, just be very careful here. Particular doctors or utilization of medical services overall? Overall. Well, this was Dr. Israel doing an economic analysis, a simulation on utilization, and concluded that Anthem did a better job controlling utilization. He acknowledged that he hadn't examined utilization as a factor. No, I know what you're referring to in the district court opinion, but he did not – A cross-examination. Yeah. I'll look at that quote. I know Dr. Israel did an analysis and concluded that Anthem did a better job in utilization. I'm forgetting exactly where the district court went wrong in that footnote, but I'll circle back to that if I can. And to finish this point on Mr. Drozdowski, the evidence was unrebutted that Anthem has more value-based relationships with providers than Cigna does. So, you know, Cigna may have a reputation of working well with providers, but that may be a product of paying more to the providers and not a matter of factual reality as to who does that best. Go ahead. Is counsel's large point, I think, on the fact side, as I'm describing it, was how is this going to happen? Yeah. Yeah. You know, Judge Cardinal, you've raised that a couple of times, and I don't think I've given a complete answer. I've talked about the theory here, the claims comparison and so forth, and how the economists and the integration team concluded that this $2. something billion was achievable by virtue of the disparity in the rates. But we also set forth a very concrete plan on how to achieve that. Anthem's been planning for a merger of this type for some time and has put in its provider contracts these affiliate clauses that allow Anthem to have its affiliates, including newly acquired affiliates, benefit from Anthem's rates. So that's kind of point one. Point two, and this is probably more important, these contracts come up with some frequency. Like if they're three-year contracts, that means a third of them are coming up every year. So renegotiation happens with considerable frequency in this industry. And if you've got more volume as Anthem, you can go to the provider and say, hey, we've got more volume, we want the whole kit and caboodle at the rates we've been enjoying. That doesn't seem like a big ask. And it hardly seems like dropping the hammer, which appears in the government's brief, as a pejorative sense of a way to deal with a provider. Well, I thought that was the Anthem CEO, maybe, if I've got the title of that right, saying, you know, look, if we go up to the affiliate clauses on day one after this merger and say, guess what, here's this nice bells and whistles Cigna product, you're going to do it, you need to do that at our Anthem price, that's what he was saying, we're not going to do that. I don't think that's right. He was asked if he would drop the hammer on providers, and he recoiled from that. And what did dropping the hammer mean when that question was asked? Well, this is a matter of interpretation, I guess, but I interpreted it to mean to use unduly harsh tactics with your providers and be overly aggressive. For example, getting even better rates with the additional volume. I'm sorry, Judge Rogers. No, go ahead. But there's no question, and this is in our brief, and it's Mr. Grozowski and Mr. Mathias and others, Anthem has these affiliate clauses in its contracts as a conscious effort to be able to make sure that it can enjoy those preferable rates when it makes acquisitions. Okay, so on that side you have the affiliate clauses, the contracts come up with providers. Then on the how is this going to happen, there's still a few more steps, right, to get that, say, the lower rates passed through. And on that, I asked about the contracts with the employers, and counsel said, well, those aren't going to guarantee the same rate of pass-through because they come up for renegotiation as well. What's your response? I'm paraphrasing, but something to that effect. You heard it. That sounds like it's a suggestion that the ASO contract will no longer be the industry standard or something. There's no evidence of that at all. These ASO contracts have been in there, have been in this industry as long as the record trial was developed. I suppose the theory would be, but I didn't ask the follow-up, but I suppose the theory would be that they'll have additional market power with the employers now, and therefore will have the ability to depart from that. Well, Dr. Israel did a merger simulation on that, right, and it was in that context that he concluded, he looked at this and he concluded, you know what, when an insurer is able to get advantageous reimbursement rates for its employers, it does, at least in the case of Anthem, take 2% and add that on to the ASO fee. So there's a little bit of recapture on the ASO fee. He looked at that in the exam and it was 2%. And I don't think the district court disputed that. In fact, the district court, to the contrary, seemed to credit that, but condemned the idea that Anthem would get 2% for its coffers as opposed to the 98%, the lion's share going to the employers. Well, the district court talked about evidence that there were Anthem documents that pass-through was last on its list of priorities for these funds. So I don't take the district court as agreeing it was just 2% and that the 98% was going to pass-through. Well, we knew different on our interpretation of what the district court was saying, because I did think that the district court at least wasn't challenging the 2%. It is true that the government identified a couple of brainstorming documents within Anthem. What about what the government identified? I'm talking about what the district court referenced in her decision. Me too. Okay. Yeah, it's the same. But again, Dr. Israel modeled this and found that as a profit-maximizing matter, the best Anthem could do was to recapture 2% of the preferable medical cost savings. So the district court's decision not to credit that was clear error? Yes. Yes. I want to interrupt. Sure. If you want to finish that, I don't know if you're done, but I would also like you to explain to me rebranding from your understanding. I don't want to interrupt first the affiliate clauses or the contracts. Okay. Well, rebranding from my perspective, it's a term that has some confusion, because in this industry it can be used to describe just generally a consumer having a different brand on the card. But we certainly mean it, particularly in the context of verifiability, and our plan is to have this combined product with the best attributes of the two companies, Anthem's rates, Cigna's customer-facing attributes, and have that branded as a blue product within the 14 states. Right. But at least the witness testimony that I saw was that's going to take some time. So up front, the rebranding is going to be switch your cards, you're now an Anthem member, because we need to do this for our best efforts requirement. But it's going to take some time to integrate and get so that we can then give you that combination that our goal is here. The testimony by Mr. Mathis, and I guess Mr. Drozdowski as well, was that it may take six months to do the transition. And you guessed at my answer, I think, when you were talking, Mr. Westridge. And yes, it's a transition period. In that transition period, the plan is for there to be a brand agnostic period where the customers can decide whether they want to stick with the Cigna product branded as such or the Anthem product branded as such. And the quote attributed to Mr. Mathis in the brief was simply a recognition that during that transition period, yes, there's no merger-specific efficiency happening there. That's just marketing of two products side by side, and we're not contesting that. We're not suggesting that if a customer on his own volition or its own volition moves from Cigna to Anthem, and there's no change in the products, that that's a merger-specific efficiency. We're not contesting that. We never have. And so just to be clear, your position is that Anthem's evidence was consistent, that it would be six months, and then we would have the Cigna product at the Anthem price? Yes. Okay, where is that six months on the record? Can you tell me again? In Mr. Mathis' testimony. Mr. Mathis said six months. Yes, and in fact, in the quote that I think you're referring to in the briefs, even that quote is Mr. Mathis saying that in that transition period, he refers to that as the short-term. And then in his testimony more broadly, he explains the short-term is this 180-day period after day one. The short-term is when you won't yet have this. And then after 180 days, you will be able to offer the Cigna product at the Anthem price. Right, yes. And again, let's talk about commercial realities for a second here too, right? So this is a merger between two independent companies, and they have to preserve their independence during the merger negotiations until there's a closing. So they contribute their data to a claim room that can only be accessed by people who aren't in management for one company or the other. And that's why McKinsey is hired in this kind of exercise, and it was hired here. So all of the data gets contributed. And, by the way, all data from both companies was contributed, so there was no interruption due to any fractionalism between the companies or anything like that. All the data was in there, and McKinsey analyzed the data and confirmed the $2. whatever billion medical cost savings that were achievable. The companies working together identified what they called the levers to accomplish those, to capture those savings. And the affiliate clause, renegotiation, and rebranding were the three levers that were identified. As to the exact lever that will be used for any specific provider, that can't be decided until the claim room is opened up and the management people can see, oh, that provider, we have this disparity between the Cigna and Anthem rates, let's do such and such. So that's really a tactical thing. But the evidence was pretty robust about the plan to achieve these medical cost savings that were independently verified in numerous ways. So could I just be clear on one thing? If I am a Cigna customer and I decide I want to stay with Cigna and the six months has passed, is Cigna still out there competing in the market? Well, good question. Here's the plan at Anthem. And I assume, Judge Asher, you're talking about in 13 states, right, because Anthem has that 14-state footprint. The plan for Anthem is to have a combined product with the best attributes of both and have that be an Anthem blue-branded product. All right, but it may not be identical to the Cigna product that I have today. Yes. Although the evidence at trial was, Anthem's done this before with the Amerigroup acquisition, and they did a preferable product taking the Amerigroup's attributes and the Anthem purchasing attributes, put them together, and then went to the former, their Amerigroup customers and said, hey, you get the exact same thing you had before. It was marketed that way at a cheaper price. Will you make the switch? Ninety-nine percent of the people made the switch. And Mr. Devite, the former CFO of Anthem, gave that testimony at trial here. So, now, I don't remember, Judge Rogers, if there was testimony about the plan as to, well, what about that one percent that may stay at Cigna? I think the plan is that they can stay there, but it sure seems unlikely that many would stay with a product when they could get what's the same product. No, I know that you said, why wouldn't I want the same product at a better price? But it's not going to be exactly the same product you've acknowledged. And so, I may still make the choice that I want to save money, but if I don't and I want to stay with this Cigna approach, that's gone, isn't it? No, the plan. I mean, outside the 14 states it may be there, but inside the 14 states it's gone. Well, no, the idea is to have the Cigna approach, right, to have those customer touch-feel qualities on the Anthem product. The idea is for this to be the best of both worlds, the best of the best, and so forth. Judge Millett, my colleague handed me, on page 14 of our grade brief, there's the discussion about Mr. Matthews' testimony about the rebranding being in the short term, and we have the site there, too. No, I'm just trying to get where the definition of short term is six months, and then at the six-month point they're going to get it. They're going to get this product we've been promising. Yeah. My recollection is that Mr. Matthews said that in his testimony, that short term means six months, 180-day period. So they would say, I think, even if we agreed with everything you've just said about how it's going to work, we still shouldn't allow this merger because these savings are coming from the exercise of anti-competitive market power on the buy side. Yeah. And I'm ending where I started, but that seems to me a big, difficult issue. Yeah, but it's one the district court didn't reach, right? The district court didn't make a conclusion about it being the exercise of market power. So I don't know how. Right, I think that's a good answer to that question. And my other part of the answer is Dr. Israel did address that issue at trial. He gave testimony and analyzed whether this was monopsony. It's a good answer, but it's not a full answer because what if it was the exercise of anti-competitive market power on the buy side? Yeah. If it was an exercise of market power on the buy side, monopsony, we are not claiming that it's a cognizable efficiency. We're accepting the rule in the merger guidelines that if it really is the exercise of market power, which means it can strengthen output, bringing the price away from the competitive level, yeah, we're not claiming that it's a cognizable efficiency. If the case came down to that, and I don't know if it could or would depending on how we resolve everything else, but if it came down to that, should we revamp? Maybe, but we ask that you consider that the government had an opportunity to put on evidence in that regard and didn't do it to the satisfaction of the district court. Why are you saying not to the satisfaction of the district court as opposed to the district court just didn't address it? Well, because the district court expressly said that there's not enough evidence to reach a conclusion as to whether there was monopsony power or not. And since it's the plaintiff's burden, the failure of proof must mean that their claim fails. Well, to follow up on this, you seem to be assuming that if it doesn't constitute monopsony power, then it must count as an efficiency, but can there not be three doors here? An efficiency, really doing more for less or new innovative product or something that's been recognized as efficiencies. Monopsony, and then door number three would be, okay, maybe it doesn't go all the way to monopsony. I don't need to find that it goes all the way to monopsony to look at this and go, this is just taking money from them and putting it in your pocket, squeezing the other competitors in this highly condensed market more. You're not making anything new. You're not doing anything more efficiently. You're just sucking up a competitor. I'm putting this in the most pejorative terms deliberately for the question. That doesn't reflect anything. But if we package it that way, isn't that what the district court found when she said it wasn't a real efficiency? I don't think so. A couple of things in that regard. Number one, door number three might exist in another case, but here, again, we're talking about robust pass-through to consumers, but this is not a mere allocation paying off Paul and Peter in the distribution chain. This is money going to consumers. So it's not a pecuniary benefit like that. Going to your consumers. Well, it's going to ours in the first instance, and we think that will have a market-wide effect that will benefit everyone. But you would agree that your product is that we get lower prices and other folks don't come down to them. Well, united. There may be market-wide implications as a result of Anthem getting better. Now, I'd further like to emphasize. May be or will be? There will be. Well, according to the unrebutted testimony of trial by Dr. Israel, that there will be pro-competitive market-wide benefits to Anthem getting lower medical costs. And the evidence, I get that you said that, the evidence that even though you've always been able to have a lower price at this time, the two remaining competitors would come down was? Well, they may. United is, you know, bigger than Anthem nationwide. And united may well.  That's correct. But comparable, comparable. And united may be able to go to the providers and make demands to get. Well, they could have done that already. Yeah. Dr. Israel did a merger simulation on this and concluded that there were market-wide benefits that were beneficial to all ASO customers nationwide. I mean, I don't know that I can explain all the causal reasons for that, but that's what the merger simulation showed, and the merger simulation is in the merger guidelines the way you're supposed to analyze these situations, right? Now, as to other aspects of why this is an efficiency, Anthem and its competitors, the insurers, are purchasing agents for the employers. If they can deliver the same network, medical network, with the same discounts and other attributes, if they can deliver that to their customers more cheaply, that's an efficiency. It's an efficiency that counteracts. It can't just be efficiency in that we think it's an economic good. Efficiency is always described as something that either negates or at least neutralizes the anti-competitive effect that's been proven. That's the defense part of it. I agree. Either neutralizing it or making it more competitive, whichever, but at least neutralizing it. I agree.  My only point here is that this is an efficiency, and it should be credited on the pro-competitive side of the balance, on the scales, because we're a purchasing agent. If we can deliver our product more cheaply, I guess I should say the same health care, and again, no change in quality, and the same other attributes, but maybe improved in some respects, if we can deliver that more cheaply to our customers, that's an efficiency. That's something we are doing. Does that negate the anti-competitive effect, or does it hinge on it? I guess you've got the model run here. Does it hinge on the fact that you also show that there will be relevant or at least material reductions in price for consumers in the relevant market, all consumers in the relevant market? No, I don't think it does depend on that, because... It doesn't. So if all it did was lower, imagine he ran the model, or she ran the model, and there was no effect shown as to the others, you would still say that negates the evidence of anti-competitiveness, because your customers will get a lower price. Well, what I'm thinking of, Judge Millett, is Dr. Israel's unrebutted testimony, which I think was credited in a sense by the district court, that only a third of the medical cost savings need to be credited in order to offset the anti-competitive harm under Dr. Israel's model. Most of the dollars to dollars, that doesn't mean anti-competitive harm is sort of a forward-looking and ongoing consequence. I'm not sure you can just sort of say we match those dollars. Well, again, the merger guidelines call for a simulation, right? This computer software simulation of the merger, and Dr. Israel not only ran his own simulation, but also plugged the claimed medical cost savings into Dr. Dranov's simulation, and even a third of them were sufficient to offset the anti-competitive harm under that model. So there's a pretty big margin of error here, and that's why our fundamental defense, that's why we're focused just on the medical cost efficiencies, the medical cost savings. We don't even need the GNA and the other things. If this court concludes that the medical cost savings ought to be considered, then we're confident we could bail either in this court or on remand, because they're so large that they swamp any claimed anti-competitive effect. The amicus briefs in this case, we have one from the consumer's union, a dog that didn't bark. We don't have one from employers that are saying, oh, this would be great, it would be hunky-dory. It's funny, Judge Kavanaugh, there were hardly any employers at trial. The government didn't bring any. We brought one who claimed that this would be a great merger. It was a win-win for everybody involved. But you're right, there are dogs that aren't barking. Do you want to hear? The reason, I'm just going to throw this out there, maybe the reason the dog didn't bark, and we have every employer in the country saying, please support this merger, is because there's uncertainty about what's really going to happen. The consumer's amicus brief points out, retrospectively, that two health insurance mergers led to premium increases in the wake of that merger. I just observed that. I don't know that I can factor that in very much here. That's not consistent with the record here. The record here is 98% pass-through to consumers. Consumers and employers should be rejoicing. They may or may not appreciate all of the economics. They may not know how great it's going to be. That is possible. That is possible. But, again, they weren't complaining either. I understand. I understand. And probably there's, and this is part of the case, there's uncertainty and you're making predictions, and that's the merger guidelines say this is, and ARETA say this is necessarily a predictive judgment. These employers in this national account segment are primarily the Fortune 500, Fortune 1000 companies. They've got some considerable bargaining power with the insurers, and they can make sure that the ASO contracts hold. All right. Thank you. All right. Do you have a last note you wanted? Yes. Last sentence. Well, just like some of those earlier examples in the consumer brief may deal with full insurance rather than ASO and may not be limited to national accounts. You're referring to those two studies? Yeah. Yes. The two examples in the amicus brief. Yeah, one of those, I think, Nevada specific. Yeah. Yeah. Okay. I was just raising the point. Thank you for your patience. Thank you. We'll take the case under advisory. Thank you.
judges: Rogers, Kavanaugh, Millett